[Cite as *Blazek v. Ohio Bar Liab. Ins. Co.*, 2023-Ohio-1722.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| James N. Blazek, et al., | : | |
| Plaintiffs-Appellants, | : | No. 22AP-473 |
| | | (C.P.C. No. 19CV-3471) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Ohio Bar Liability Insurance Co., | : | |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on May 23, 2023

**On brief:** *The Behal Law Group LLC*, and *John M. Gonzales*, for appellants. **Argued:** *John M. Gonzales.*

**On brief:** *Weston Hurd LLP*, and *Edward G. Hubbard*, for appellee. **Argued:** *Edward G. Hubbard.*

APPEAL from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} Plaintiffs-appellants, James N. Blazek and Pillar Title, appeal from a decision of the Franklin County Court of Common Pleas entered July 5, 2022 denying Mr. Blazek and Pillar Title's motion for summary judgment and granting the motion for summary judgment submitted by defendant-appellee, Ohio Bar Liability Insurance Company ("OBLIC"). For the following reasons, we affirm the judgment of the trial court.

**I. Facts and Procedural History**

{¶ 2} This matter arises from an insurance coverage dispute. Since May 1, 2015, appellee OBLIC has provided professional liability insurance to appellants James Blazek and the title company he owns and operates, Pillar Title. (Blazek Depo. at 7, 11.) The policy, which is commonly known as a "claims made and reported" policy, has been renewed

annually. (Compl. Ex. 1.) While the general dispute before the trial court was whether OBLIC wrongfully denied Mr. Blazek's claim, the crux of the disagreement is the meaning of "policy period" as used to determine timely reporting of a claim.

**A. The OBLIC Insurance Policy**

**{¶ 3}** Beginning in 2015, Mr. Blazek and Pillar Title elected to enroll in a type of professional liability insurance known as a "claims made and reported" policy. This phrase is displayed prominently on the front page of the policy, with a notice below it that states coverage is available for "only those **'Claims'** that are first made against the Insured and reported to the Company during the **'Policy Period'** or a relevant **'Extended Reporting Period.'**" (Emphasis in original.) (Compl. Ex. 1 at 1.) Section I of the policy addresses coverage and restates the conditions provided on the cover page, stating that the insurer will pay all sums that the insured is obligated to pay as money damages because of "any **'Claim'** first made against the Insured and reported in writing to the Company during the **'Policy Period,'** pursuant to **Condition VI** of this policy[.]" (Emphasis in original.) (Compl. Ex. 1 at 2.) Pursuant to Condition VI, the insured must give written notice to OBLIC "as soon as practicable" once the insured becomes aware of an event that is reasonably expected to form the basis of a claim against the insured for money damages. (Compl. Ex. 1 at 11.) The policy defines a **"Claim"** as "a demand received by the Insured for money damages[.]" (Compl. Ex. 1 at 3.) **"Policy Period"** is defined as "the period of time between the inception time and date shown in the Declarations and the time and date of termination, expiration or cancellation of coverage for the Named Insured[.]" *Id.*

**{¶ 4}** The policy coverage began on May 1, 2015 and remained in effect until 12:01 a.m. on May 1, 2016, at which point Mr. Blazek could renew the policy for another one-year term or allow it to expire. (Compl. Ex. 1.) An alternate basis to terminate coverage is through cancellation, which either party to the policy can invoke. (Compl. Ex. 1 at 13-14.) Mr. Blazek renewed the policy each year through 2019. Consequently, with each annual renewal, he received a new copy of his "Professional Liability Claims-Made and Reported Policy" and a new Declarations page reflecting the updated policy period. (*See, e.g.*, Compl. Ex. 1.) Each Declarations page listed the following five items: (1) the named insured(s); (2) the policy period; (3) limits of liability; (4) the deductible amount; and (5) the total policy premium. *Id.* While the terms of the policy stayed the same or substantially similar from

year to year, the Declarations page issued upon renewal reflected changed items, including the new policy period.

### B. Discovery of Wire Transfer Scam and Potential Coverage

**{¶ 5}**    Mr. Blazek served as the title agent for a residential real estate transaction in 2016.  Once the real estate sale was finalized, a processor for Pillar Title, Michelle Peters, mailed the property sellers a check on September 21, 2016 for the escrowed sale proceeds in the amount of $93,532.09.  (Mar. 16, 2020 Blazek Aff. at ¶ 10; Blazek Depo. at 37.)  Two days later, Ms. Peters received an email from someone who appeared to be the sellers' real estate agent.  (Blazek Depo. at 37)  The purported agent claimed the sellers preferred to have the funds wired to them directly and provided their bank account information, assuring Pillar Title that the mailed check had already been shredded. (Blazek Aff. at ¶ 11.) Believing the request and provided email address were legitimate, Ms. Peters promptly transferred the funds. (Blazek Aff. at ¶ 12; Blazek Depo. at 38.) Shortly thereafter, Mr. Blazek discovered the request was a scam—the wire transfer request had not come from the sellers' real estate agent, as believed, but an unauthorized third-party who had intercepted their communications and impersonated the agent.  (Blazek Aff. at ¶ 13; Blazek Depo. at 39.)

**{¶ 6}**    When the sellers—unaware of what had transpired—deposited the sale proceeds check from Pillar Title, the duplicate and nearly simultaneous payments of $93,532.09 unexpectedly plunged the escrow account into the negatives.  (Blazek Depo. at 38.)  Later that day, a seller from a separate real estate transaction attempted to cash a check from Pillar Title and was informed by the bank that the escrow account contained insufficient funds to complete the deposit. (Blazek Depo. at 39.) Concerned about a frustrated, unpaid seller and the reputation of his title company, Mr. Blazek quickly marshalled enough cash from the title company and his own personal funds to cover the bounced check and remedy the account deficiency.  (Blazek Depo. at 21, 46, 48; Blazek Aff. at ¶ 14.)

**{¶ 7}**    Mr. Blazek worked with law enforcement to prosecute the individual behind the wire transfer scam and retrieve the lost funds. (Blazek Depo. at 42-43.) Despite his efforts, the money was never recovered.  (Blazek Aff. at ¶ 15.) He reported the loss to his insurer's underwriter and informally consulted with a former law school classmate who was

also in the title business. (Blazek Depo. at 19, 22-23.) No one Mr. Blazek spoke to suggested he file a claim with OBLIC; on the contrary, his law school classmate expressed doubt his insurance policy would cover this type of loss. (Blazek Depo. at 23-24.) He had similarly concluded the email scam was most akin to a loss from a cyber-security attack, an event that was not covered without the purchase of additional insurance. (Blazek Depo. at 28-29.) Mr. Blazek did not contact OBLIC to discuss potential coverage under his policy. Nor did he review the policy himself, instead relying on his recollection of the terms from when he first enrolled. (Blazek Depo. at 17, 24.)

{¶ 8} While attending an underwriting seminar in August 2018, Mr. Blazek was surprised to learn that other title agents had successfully submitted claims for the type of loss he experienced in 2016. (Blazek Depo. at 32.) He called OBLIC and explained the situation to a representative, including his revelation from the seminar. The representative agreed the type of loss Mr. Blazek described was covered under the policy. After the seminar, Mr. Blazek followed up with an email to OBLIC to formally provide written notice of his claim. (Blazek Depo. at 33.)

{¶ 9} Soon thereafter, OBLIC denied the claim. OBLIC provided Mr. Blazek two reasons for the denial: (1) the claim against Mr. Blazek and Pillar Title was not made during the same policy period as when it was reported; and (2) Mr. Blazek and Pillar Title voluntarily paid the claim against them in violation of a policy condition. (Mar. 10, 2020 Stip.)

### C. Trial Court Proceedings

{¶ 10} On April 26, 2019, Mr. Blazek and Pillar Title brought an action in the Franklin County Court of Common Pleas seeking a declaratory judgment that coverage existed under the terms of the policy and OBLIC breached the insurance agreement by denying the claim. The parties filed cross-motions for summary judgment on March 16, 2020. Mr. Blazek and Pillar Title argued the "policy period" ends on the "date of termination, expiration or cancellation of coverage," and the policy has remained continuously in effect through ongoing annual renewals. (Compl. Ex. 1 at 3.) In its motion, OBLIC asserted the denial was proper because Mr. Blazek did not report the claim during the same policy period it was made against him.

{¶ 11} The trial court entered summary judgment in favor of OBLIC and against Mr. Blazek and Pillar Title on July 5, 2022. In its decision, the trial court found the clear and unambiguous policy terms require a claim to be reported during the same policy period it is made against the insured, the policy period is the one-year term listed on the Declarations page, and Mr. Blazek's delayed report failed to trigger coverage under the terms of his policy. (July 5, 2022 Decision and Judgment Entry at 8.)

{¶ 12} Mr. Blazek and Pillar Title timely appeal that judgment.

## II. Assignment of Error

{¶ 13} Appellants assign the following assignment of error for our review:

> [I.] The Trial Court erred by denying Plaintiffs-Appellants' Motion for Summary Judgment.

## III. Discussion

{¶ 14} This court reviews an entry of summary judgment using a de novo standard of review. "De novo appellate review means the court of appeals conducts an independent review, without deference to the trial court's decision." *Garrison Southfield Park L.L.C. v. Aspen Specialty Ins. Co.*, 10th Dist. No. 21AP-21, 2022-Ohio-709, ¶ 26. "In determining whether a trial court properly granted summary judgment, an appellate court must review the evidence according to the standard set forth in Civ.R. 56, as well as that stated in applicable case law." *Grange Mut. Ins. Co. v. Patino*, 10th Dist. No. 19AP-278, 2020-Ohio-466, ¶ 22.

{¶ 15} Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Civ.R. 56(C). "Thus, a party seeking summary judgment on the grounds that a nonmoving party cannot prove its case bears the initial burden of informing the trial court of the basis for the motion and must identify those parts of the record which demonstrate the absence of a genuine issue of material fact on the elements of the nonmoving party's claims." *Patino* at ¶ 23, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292-93 (1996).

{¶ 16} An insurance policy is a contract, and its interpretation is a question of law. *Acuity v. Masters Pharmaceutical, Inc.,* 169 Ohio St.3d 387, 2022-Ohio-3092, ¶ 11. "When

confronted with an issue of contract interpretation, our role is to give effect to the intent of the parties. We will examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. In addition, we will look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Sunoco, Inc. (R&M) v. Toledo Edison Co.,* 129 Ohio St.3d 397, 2011-Ohio-2720, ¶ 37. "When interpreting a contract, we will presume that words are used for a specific purpose and will avoid interpretations that render portions meaningless or unnecessary." *Capital City Community Urban Redevelopment Corp. v. Columbus*, 10th Dist. No. 08AP-769, 2009-Ohio-6835, ¶ 30.

{¶ 17} "In order to recover on a claim for a breach of an insurance contract, a plaintiff must prove that a policy of insurance existed and that the claimed loss was covered under the policy." *Patino* at ¶ 31. "Insurance policies include both claims made policies and occurrence policies." *Garrison Southfield Park L.L.C.* at ¶ 29. *See also Kentucky Med. Ins. Co. v. Jones*, 10th Dist. No. 02AP-817, 2003-Ohio-3301, ¶ 59. Under a "claims made" policy, the insured must present a claim to the insurer within the defined policy period (or extended period, if applicable) to trigger coverage. *Garrison Southfield Park L.L.C.* at ¶ 29.

{¶ 18} Appellants do not dispute the characterization of Mr. Blazek's policy as a claims made policy. Instead, they assert the trial court erred in concluding the meaning of "policy period" in the agreement was unambiguous and thus rendered Mr. Blazek's report untimely. In support of this argument, appellants highlight specific language in the definition of "policy period:" "the period of time between the inception time and date shown in the Declarations" and "the time and date of termination, expiration or cancellation of coverage[.]" (Compl., Ex. 1, at 3.) Because "inception" is not defined in the agreement and the policy does not identify a specific Declarations page, appellants assert the original date of enrollment, May 1, 2015, could reasonably be interpreted as the "inception" date of the policy period. Likewise, because the policy has never been cancelled or permitted to expire, it never terminated, which would allow the wire fraud loss to be reported at any time so long as the policy remained in effect and uninterrupted.

{¶ 19} Appellants' interpretation of the inception date requires us to ignore the second half of the phrase, "shown in the Declarations." Mr. Blazek received a new Declarations page with each annual renewal. Every year, that new Declarations page contained an updated inception date reflecting the date of renewal. If appellants' interpretation was correct, the beginning date of the policy period *shown in the Declarations* would have remained May 1, 2015 interminably. Appellants' explanation of the policy period's end-date (or lack thereof) is similarly unpersuasive. Continuous coverage existed because Mr. Blazek did not cancel his policy and OBLIC opted to renew his enrollment each year. The option to renew for a successive term does not mean the duration of a contract is perpetual or indefinite.

{¶ 20} This court has previously addressed whether renewals under a "claims made" policy extend the applicable reporting period. In *Asp v. Ohio Med. Transp., Inc.*, 10th Dist. No. 00AP-958, 2001 Ohio App. LEXIS 2865, *9 (June 28, 2001), a business was denied coverage by its insurer for reporting a claim outside the policy period. On appeal, the entity contended its "policy period" extended from the initiation date of its first insurance contract (April 3, 1995) to the expiration date of its last insurance contract (April 3, 1999). This court noted the policy period was "the definitive dates declared in the policy's 'Declarations' page." *Id*. at 8. Even though the policy number remained the same and the subsequent policy was considered a renewal, this court held that "without a statement in the contract that a renewal operates as an extension of coverage, merely renewing a claims-made policy does not extend the 'policy period' in the contract." *Id*. at *11. *See also Wright State Physicians, Inc. v. Doctors Co.*, 1st Dist. No. 2014 CV 05685, 2016 Ohio Misc. LEXIS 18967, *63 (Mar. 25, 2016). Here, too, the length of the policy period stated on the Declarations page is not affected simply because the policy systematically renews at the end of each one-year term.

{¶ 21} Furthermore, adopting this interpretation would require the court to render other provisions of the policy mere surplusage, contravening well-settled principles of contract interpretation. *See, e.g.*, *Buckeye Wellness Consultants, LLC v. Hall*, 10th Dist. No. 20AP-380, 2022-Ohio-1602, ¶ 13. The policy defines "Effective Date," as used in Exclusion (i), as "the date on which coverage became effective under the first policy issued by the Company, provided the same or substantially similar coverage has been in force

continuously without interruption under this or any prior policies issued by the Company." (Compl. Ex. 1 at 3.) In contrast, the beginning date of the "Policy Period" is defined as "the inception time and date shown in the Declarations." *Id.* Exclusion (i) discusses coverage for acts which occurred before the first policy was issued to the insured, i.e., before the effective date of the policy. (*Id.* at 6.) This distinguishes the first date of enrollment from the date of renewal, which is the inception date "shown in the Declarations" and which changes every year. The provisions reflect an intent to differentiate the original date of enrollment from the beginning of a new policy period.

{¶ 22} Appellants attempt to create ambiguity over the termination date of the policy by reading the definition of "Policy Period" in isolation. However, any potential ambiguity is resolved by giving full force and effect to the contract as a whole. A "Policy Period" ends at the "date of termination, expiration or cancellation of coverage[.]" (Compl. Ex. 1 at 3.) This clause, unlike the "inception date" preceding clause, does not contain the phrase "shown in the Declarations" and is appellants' basis for the claimed ambiguity. However, this interpretation fails to account for the two methods by which coverage may terminate: cancellation midway through the term or at the expiration of coverage. Cancellation of the policy ends coverage at a date earlier than the one listed on the Declarations page. Conversely, the natural end of coverage occurs on the date listed on the Declarations page.

{¶ 23} Appellants argue coverage was never permitted to expire because the policy was renewed each year by OBLIC. However, whether a renewal operates as a continuation of the contract, or a new contract altogether, is dependent upon the language of the policy. *Dixon v. Professional Staff Mgt.*, 10th Dist. No. 01AP-1332, 2002-Ohio-4493, ¶ 25. This court considers several factors to make this determination, such as whether the Declarations page contains a policy period with a set duration, indications that coverage only applies to loss that occurs during a specific policy period, and whether the insurer has authority to renew the policy or allow it to expire at the end of the term. *Id.* at ¶ 27-28. *See also Benson v. Rosler*, 19 Ohio St.3d 41, 44 (1985), *limited in part on other grounds, Wolfe v. Wolfe*, 88 Ohio St.3d 246 (2000) (insurance policy constituted a new contract upon each successive renewal because policy was written for a specific duration and terminated if insurer elected not to renew); *Gibbons-Barry v. Cincinnati Ins. Cos.*, 10th Dist. No. 01AP-

1437, 2002-Ohio-4898, ¶ 23 (express provision authorizing insurer not to renew the policy indicated renewal was a new policy as compared to extension of former policy). Here, the Declarations page contains a policy period with a set duration, coverage under the policy applies only to loss occurring during a specific policy period, and OBLIC has the right to renew the policy or allow it to expire at the end of a defined term. Therefore, all three factors support a conclusion that each renewal creates a separate contract of insurance rather than the continuation of the same policy. Reading the contract as a whole, each policy renewal operates as a new contract of insurance and thus the date of expiration is the projected end-date listed in the declarations. Upon renewal, a new "inception time and date" begins and a new Declarations page is issued containing the new duration of the policy.

{¶ 24} To trigger coverage, Mr. Blazek was required to report the claim made against him for money damages in September 2016 before the end of his policy period on May 1, 2017. We concur with the trial court's assessment that because Mr. Blazek waited to notify his insurer of the claim until August 2018, he failed to satisfy that requirement, and coverage was properly denied.

## IV. Disposition

{¶ 25} Based on our independent review of the record, we hold the trial court's judgment denying Mr. Blazek and Pillar Title's motion for summary judgment and granting summary judgment in favor of OBLIC is in accordance with the law. We overrule appellants' sole assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and BOGGS, JJ., concur.